**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PAMELA NELSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 10 C 3954** |
| ) | |
| **LEVY HOME ENTERTAINMENT, LLC,** ) | |
| **CHAS LEVY COMPANY, LLC,** ) | |
| **CAROL KLOSTER, ADAM ZOLDAN,** ) | |
| **JANET KREY,** ) | |
| **and SARAH DONALDSON,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Pamela Nelson sued Levy Home Entertainment, LLC, Chas Levy Company, LLC, Carol Kloster, Adam Zoldan, Janet Krey, and Sarah Donaldson in the Circuit Court of Cook County. She asserted a federal employment discrimination claim and state law claims for retaliatory discharge and unjust enrichment against the defendant LLCs (collectively Levy), as well as a state law defamation claim against all defendants. Defendants removed the suit to federal court, and Levy Home Entertainment (LHE) asserted a counterclaim for conversion.

Nelson later voluntarily dismissed her employment discrimination claim. The Court determined to retain jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c) for reasons described in an oral ruling on July 20, 2011.

Defendants have moved for summary judgment on all of Nelson's claims and on

LHE's counterclaim. For the reasons stated below, the Court grants defendants' motion in part and denies it in part.

## Background

Levy is a wholesale distributer of books that buys from publishers and sells to retailers such as Wal-Mart, Kmart, and Target. Nelson began working for Levy in 1985 and was promoted to Sales Promotions Director in 2002. In this position, she organized and oversaw various events for the retailers and publishers to promote books to the public. Levy's Chairperson, Barbara Kipper, and its CEO, Caroline Kloster, knew Nelson and thought very highly of her work.

In September 2008, however, Levy terminated Nelson. Levy provides the following explanation for its dismissal of Nelson. In early July 2008, Sarah Donaldson, one of Nelson's subordinates, traveled with Erin Padilla, a vice president in another part of the company. During the trip, Donaldson told Padilla that she was concerned about some of Nelson's practices. In particular, Donaldson mentioned that Nelson was spending a lot of money on promotions that did not seem to be creating many additional sales and that she was uncommunicative to her subordinates regarding event costs. Donaldson thought that some of the event spending improperly benefitted Nelson's friends and family. Donaldson also said that Nelson had her subordinates ignore the policies of her boss, John Donohue. Padilla encouraged Donaldson to take this information to Donohue.

After Donaldson reported her concerns to Donohue, he went to his superior, Adam Zoldan. Zoldan reported Nelson's alleged misconduct to CEO Kloster. Kloster assigned Lou Keiler, Levy's general counsel, and Sandy Jubach, Levy's head of human

resources, to investigate the allegations against Nelson.  Kloster also instructed

Donohue and Zoldan to stay out of the investigation, because she was concerned that

they were relatively new to the company and might judge a long-term employee like

Nelson too harshly.

During their investigation, Jubach and Keiler talked to Nelson's subordinates and

looked at her expense reports and records.  They did not initially talk to Nelson.  Jubach

and Keiler found considerable evidence that they believed showed that Nelson was

violating Levy policies and misusing company funds.  This included information that

Nelson had spent large amounts of money improperly at events and had circumvented

Levy policies to do so.  For example, Nelson had her subordinates pay for business

meals that she attended, in violation of company policy, so that Nelson herself, and not

her superior, would be the person responsible for approving the expense.

The investigators also determined that Nelson had falsely reported that her

subordinates attended some lunches for which she submitted expense reports and that

she had invited family and personal acquaintances to other business meals.  Perhaps

more significantly, Nelson had purchased $8,800 in American Express gift checks and

been reimbursed for them by Levy.  Gift checks were frequently used by Levy

employees who worked at promotional events.  The investigators found that Nelson had

endorsed more than $7,000 worth of the checks herself and had deposited proceeds

directly into her bank account or had used them to purchase personal items.

After CEO Kloster saw the evidence against Nelson, she, Keiler, and Jubach met

with Nelson on September 2, 2008 to confront her about the problems with her

expenses.  Kloster did not believe Nelson's explanations and suspended her without

pay, but she gave Nelson ten days to prove that she had properly used all of the gift cards. Levy claims that Nelson had access to her own files during this time, and she provided Kloster documents supporting some of her expenditures and a letter explaining and defending her actions. Kloster found Nelson's explanations unsatisfactory and terminated her after discussing the evidence with chairperson Kipper.

Nelson does not dispute that she made the majority of the expenditures that Kloster found improper. Instead, she offers various explanations for why the expenditures were innocuous, consistent with Levy's practices, or for Levy's benefit. She also contends that Kloster did not actually confront her with the evidence against her and did not provide her a real opportunity to explain herself. In particular, Nelson contends that during the ten days she had to substantiate her expenses, she was not allowed to see her expense reports or the American Express checks and was not allowed access her computer files.

Nelson contends that the investigation into her expenses was no more than a pretext for firing her. She claims that the real reason she was terminated is that she refused her supervisor Donohue's instructions to cheat Levy's clients. One part of Levy's business was to pass promotional incentive money, called co-op money, from publishers to retailers. Nelson claims that some time before August 5, 2008, Donohue instructed her to improperly take co-op money as profit for Levy instead of passing it along to retailers, and she refused. On August 5, Nelson wrote Donohue an e-mail that was primarily a justification of her high spending on promotional events, but that also stated that publishers demanded detailed reports on how Levy spent their promotional dollars, so it was unwise for Levy to make a profit from the promotional money. Nelson

4

claims that she ended the e-mail by saying that she did not want to end up in jail like employees of Advanced Marketing Services (AMS). Donohue had previously worked at AMS, and other executives at the company had been convicted and incarcerated after misusing promotional money from publishers. The copies of the e-mail produced by the parties do not include any references to AMS or jail. Nelson explains this discrepancy by claiming that Levy subsequently altered the e-mail.

Nelson claims that she was fired in retaliation for her refusal to agree to Donohue's improper request. She concedes, however, that she never mentioned Donohue's instructions to anyone else at Levy or to any authorities. In particular, Nelson did not mention the co-op money when writing the letter to Kloster explaining her expenses or in a telephone conversation she had with Kloster and Jubach on September 12, 2008. On September 2, Nelson also forwarded to Keiler her August 5 e-mail to Donohue, but she characterized the e-mail only as an explanation of her lavish promotional spending, and the e-mail she forwarded did not contain any mention of AMS or going to jail.

After Levy terminated Nelson, her former subordinate Renna Thomas heard Janet Krey, another of Nelson's former subordinates, state several times that Nelson was terminated for stealing, was using Levy's money, and was doing things under the table. Nelson also claims that Kloster told Rhonda Rose, a woman who works at the publisher HarperCollins, details regarding Nelson's termination.

Three of Nelson's expense reports from her final months at Levy are also the subject of claims in this suit. One expense report, dated July 30, 2008, stated that Nelson had spent $9,387.55 on Levy's behalf. Levy never reimbursed Nelson for this.

On August 20, Nelson submitted another request for $7,157.71 in expenses she said she had incurred at a Marriott hotel. Levy paid this amount to Nelson. Marriott did not actually bill Nelson, however; instead, it sent a bill directly to Levy. Levy paid Marriott and now seeks to recover the money it paid Nelson. Nelson also submitted an expense report on September 15 after she was terminated, though it was mistakenly dated August 15, seeking reimbursement of $1,870.13. Levy did not reimburse Nelson for this either.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Nelson has made claims of common law retaliatory discharge, retaliatory discharge under the Illinois Whistleblower Act, defamation *per se*, and unjust enrichment. Defendants seek summary judgment on all four of Nelson's claims and on LHE's conversion counterclaim.

## 1.      Common law retaliatory discharge

Nelson claims that Levy terminated her because she refused to participate in

Donohue's improper plan to take co-op money as profit for Levy instead of using it for the benefit of retailers. Although in Illinois employment is usually at will, one exception is that "[a] discharged employee may sue her employer for the common law tort of retaliatory discharge if her discharge was in retaliation for certain actions that are protected by public policy of Illinois." *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 940 (7th Cir. 2002).

To prove a common law claim of retaliatory discharge, an employee must demonstrate "that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009). One protected activity is "refus[al] to engage in illegal or unsafe activities." *Michael v. Precision Alliance Group, LLC*, _ Ill. App. 3d _, 952 N.E.2d 682, 687 (2011).

Levy contends that there is no evidence that its personnel who decided to terminate Nelson were aware of her refusal of Donohue's alleged instructions. Levy contends that it terminated Nelson for valid reasons: she had improperly reported expenses and had misused company money.

A retaliatory discharge claim requires causation, where "the ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 163, 601 N.E.2d 720, 730 (1992). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Id.* at 160, 601 N.E.2d at 728 (no causation when it was undisputed that plaintiff could not perform any job for employer). Generally, the person who actually decides to terminate an employee must have a retaliatory motive, although

7

"[c]ausation may be demonstrated, despite the decisionmakers' absence of a retaliatory motive, if the terminated employee can show that the ultimate decisionmakers solicited and relied upon a general evaluation of his performance by an employee who possessed a retaliatory motive." *Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1160–61 (7th Cir. 1995); *see Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 941 (7th Cir. 1999) (in retaliation case under Illinois nursing home statutes, plaintiff had presented evidence of causation when two employees who recommended terminating her, but did not make final decision, were aware that she had complained about mistreatment of patients).

In this case, Nelson has presented no evidence that she or Donohue told anyone else at Levy of her claimed refusal of his allegedly improper instructions regarding co-op money. Donohue played a small part in the initiation of the investigation, because he passed along to Zoldan allegations from Donaldson, Nelson's subordinate. But CEO Kloster testified, in her deposition, that she was the person who made the decision to begin an investigation. Def. Ex. 2 at 90–92. Furthermore, both Kloster and Jubach testified that Kloster told Zoldan and Donohue to stay out of the investigation of Nelson. Def. Ex. 1 at 66, Def. Ex. 2 at 90–92. Jubach, who along with Keiler actually performed the investigation, also testified that she spoke to Donohue only during the initial meeting at which Zoldan brought Donaldson's concerns to Kloster. Def. Ex. 1 at 45. Kloster made the final decision to terminate Nelson after discussing the evidence with Kipper, and Donohue played no part in the decision. Def. Ex. 2 at 109. There is no contrary evidence. The fact that Donohue did not participate "is highly probative on the issue of causation." *Meister*, 43 F.3d at 1160.

8

Nelson testified that in her e-mail to Donohue, she wrote at the end that she "did not want to end up in jail like AMS employees or Adam Zoldan and his employees or something to that [e]ffect." Def. Ex. 3 at 42. Nelson also notes that Donohue stated during his deposition that if he had received an e-mail with such a statement, he would have immediately taken it to Zoldan and Kloster. Pl. Ex. L at 19–20. He stated that he would have done this because such statements would have been "ridiculous" and "inappropriate." *Id.* at 20. Nelson suggests, without coming right out and saying it, that because she mentioned the possibility of going to jail in her e-mail to Donohue, he must have told Kloster and Zoldan about her refusal to misuse co-op funds.

At his deposition, Donohue denied that the e-mail ever contained any mention of AMS or going to jail. *Id.* at 19–20. He also stated that Nelson never told him that she believed taking co-op funds to profit Levy was improper or illegal. *Id.* at 11. CEO Kloster testified that she never heard that Nelson had mentioned anything about going to jail and that no one had approached her (Kloster) about problems with the way that Levy handled co-op funds. Def. Ex. 2 at 65–66, 179. In her deposition, Nelson acknowledged that, other than in the e-mail, she had never written anything that memorialized his allegedly improper instructions, and that she had never told anyone else about Donohue's instructions. Def. Ex. 3 at 33, 42. Thus Nelson's contention that Kloster, Zoldan, or others involved in the termination decision were aware of her alleged refusal to misuse co-op funds is premised on, and only on, her testimony about what the e-mail originally said.

No copy of the e-mail presented by the parties includes any mention of AMS or going to jail. Generally, a party may prove the contents of a writing, such as Nelson's e-

9

mail, only by producing the document itself.  Fed. R. Evid. 1002; *see Dugan v. R.J.*

*Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2004) (district court could properly strike

affidavit that quoted document without attaching copy of it); *Cacique, Inc. v. V&V*

*Supremo Foods, Inc.*, No. 03 C 4230, 2004 WL 2222270, at *2–3 (N.D. Ill. Sept. 30,

2004) (at summary judgment, striking parts of declaration that attempted to describe the

contents of specific documents).  Nelson claims, however, that Levy altered the original

e-mail.  Other evidence of the contents of the e-mail is admissible if "all the originals are

lost or destroyed."  Fed. R. Evid. 1004(a).  Accordingly, under Federal Rule of Evidence

1008, the Court must determine whether the original e-mail has been destroyed by

alteration, which is what is required to make admissible Nelson's testimony regarding its

purported contents.  Nelson must show this by a preponderance of the evidence.

*United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008); *see United States v.*

*McGaughey*, 977 F.2d 1067, 1071–72 (7th Cir. 1992) (noting that district court properly

found original document was destroyed); Fed. R. Evid. 104(a), Advisory Committee

Notes on Proposed Rule ("To the extent that these [admissibility] inquiries are factual,

the judge acts as a trier of fact.").

Beyond Nelson's own testimony that she originally mentioned AMS and going to

jail in her e-mail to Donohue, she offers the affidavit of Daniel Sullivan, an information

technology manager, to prove that the e-mail was altered.  Sullivan states in an affidavit

that the e-mail, which was sent on August 5, 2008, contains metadata showing that

someone altered it on August 12, 2008.  Pl. Ex. M at 2.  He provides a copy of the

metadata, which indicates that it was modified by Nelson, or someone using her log-in

information.  *Id.* at 9.  Sullivan's affidavit and the metadata do not indicate how the e-

mail was modified or if the modification had anything to do with deleting a reference to going to jail or AMS.

Levy argues that the Court should not consider Sullivan's affidavit because Nelson never disclosed him as an expert witness, and thus Levy never received an expert report as required by Federal Rule of Civil Procedure 26(a)(2) or any other notice of his conclusions prior to Nelson's filing of her summary judgment response. There is merit to Levy's contention. But even were the Court to consider Sullivan's affidavit together with Nelson's testimony, Nelson has not provided evidence sufficient to show that the e-mail was altered by someone other than her in the way she suggests.

The text of the e-mail also strongly suggests that the e-mail never had a statement about jail in it. The e-mail primarily justifies Nelson's high spending on promotional events. It includes two statements in which Nelson indicates that publishers would be unhappy if Levy turned a profit on promotional events, but no statement, or even a hint, that she believed that profiting from those events would be criminal. *Id.* at 909-002–003. Indeed, Nelson indicates in the e-mail that she previously had generated a profit for Levy on some promotional events and stopped only when publishers started demanding detailed expense reports. Def. Ex. 9 at 909-003. If Nelson were concerned that following Donohue's instructions might lead to imprisonment, it is unlikely that she would not have admitted that she had done exactly what he asked in the past. Nelson concluded the e-mail by suggesting that Donohue not change the way promotional spending was handled by requiring her to reduce promotional expenses, but that she would ultimately do whatever he said. *Id.* at 909-003–004. It would not make sense for Nelson to write in what she claims was the

second-to-last paragraph of the e-mail that she would do whatever Donohue told her to do, and then to conclude the e-mail by stating that she did not want to go to jail for following his instructions.

It is also unclear why the e-mail would have been modified on August 12. Nelson ask the Court to conclude that someone at Levy was deleting certain sections of her e-mail while she still worked at Levy. But Kloster did not confront Nelson with the results of the investigation until September 2, and it was not until September 12 that Nelson wrote an e-mail to Kloster, Keiler, and Jubach indicating that she would not admit guilt or agree to retire. Def. Ex. 9 at 388.

When Nelson forwarded the e-mail to Keiler, on September 2, the forwarded version did not contain the language that Nelson says was deleted. Yet Nelson seemingly did not notice this, because she made no mention of it to Keiler (in the e-mail or otherwise) or to anyone else. Rather, she told Keiler only that it explained why her expenses were high; she did not mention co-op funds or jail to him. Def. Ex. 9 at 909-005.

The Court finds that Nelson has failed to show by a preponderance of the evidence that Nelson's e-mail to Donohue was altered to remove references to jail or AMS. Because such a finding is a necessary predicate to admission of testimony by Nelson about the e-mail's purported contents, the Court concludes that her testimony about the contents is inadmissible. Fed. R. Evid. 1002. Because there is no admissible evidence to show that Nelson's e-mail mentioned jail, no reasonable jury could find that Donohue took the e-mail to Kloster and thus told Kloster about Nelson's refusal to follow his improper instructions.

Nelson nonetheless argues that Kloster, who made the decision to terminate her, and Krey, who Nelson claims was involved in the investigation, had a retaliatory motive because their positions would have implicated them in any attempt to misuse co-op money. But even if Kloster and Krey were involved in redirecting co-op funds, there is no evidence that they knew Nelson had refused to participate, which is what would be needed to give them a motive to retaliate against her. *See Marin v. Am. Meat Packing Co.*, 204 Ill. App. 3d 302, 307–08, 562 N.E.2d 282, 286 (1990) (even though company nurse had made derogatory comment about plaintiff's worker's compensation claim, company decision maker had no retaliatory motive because he was unaware of plaintiff's claim).

In addition, there is evidence that Levy's investigation into Nelson began before she wrote her e-mail to Donohue on August 5, 2008 and thus before anyone had a motive to retaliate against her. In a memorandum, Padilla wrote that her initial conversation with Donaldson about Nelson's misconduct occurred on July 8. Def. Ex. 9 at 311. Donohue also wrote to Nelson and her employees on July 22 that he was concerned about expenses and he would have to approve further expenses. *Id.* at 316–17. On July 29, Kathleen Koelbl, one of Nelson's subordinates, reported to Donohue that Nelson had improperly expensed a meal involving her friends and family and a book club with which she was associated. *Id.* at 370. Donohue forwarded the information to Jubach. *Id.* Although Levy continued to investigate Nelson and interview her subordinates after Nelson contends she refused Donohue's instructions to misuse co-op funds, "temporal proximity alone is not enough to prove" that a justification for terminating an employee was pretextual. *Bourbon v. Kmart Corp*, 223 F.3d 469, 473

(7th Cir. 2000).

For these reasons, no reasonable jury could find that any Levy employee other than Donohue knew of Nelson's refusal to misdirect co-op funds or that Donohue was involved in the investigation and termination of Nelson beyond the fact that he passed along Donaldson's concerns.  As a result, no reasonable jury could conclude that Kloster's decision to terminate Nelson was caused by any retaliatory motive.  *See Meister*, 43 F.3d at 1160–61 (no retaliatory discharge claim when decision makers did not have a retaliatory motive, even though an employee who had threatened to get revenge on plaintiff was interviewed by investigators and wrote a memo supplying shipping data that was used as evidence to terminate plaintiff).  Accordingly, Levy is entitled to summary judgment on this claim.

## 2.    Retaliation under Whistleblower Act

Nelson has also brought a claim under the Illinois Whistleblower Act. The Act provides that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule or regulation."  740 ILCS 174/20.  "[I]n order to sustain a cause of action under the Act, a plaintiff must establish that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) his employer retaliated against him because of that refusal."  *Sardiga v. Northern Trust Co.*, 409 Ill. App. 3d 56, 61, 948 N.E.2d 652, 656–57 (2011).  A Whistleblower Act claim requires the plaintiff to show that refusal to participate in an illegal activity caused her employer to retaliate against her.  *See Robinson v. Stanley*, No. 06 C 5158, 2011 WL 3876903, at *5–7 (N.D. Ill. Aug. 31, 2011) (analyzing retaliatory discharge claim and Whistleblower Act claim

14

similarly, and concluding that summary judgment was warranted because plaintiff had not presented any evidence that she was terminated because of her protected activities); *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568–69, 900 N.E.2d 353, 359–60 (2008) (analyzing causation in retaliatory discharge and Whistleblower Act claims together).

Neither party argues that the Court should analyze this claim differently from the common law retaliatory discharge claim. The Court grants summary judgment in favor of Levy on this claim, because, as discussed above, there is no evidence from which a reasonable jury could conclude that Kloster had a retaliatory motive when she dismissed Nelson.

**3.      Defamation**

To succeed on a defamation claim, a plaintiff must prove "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 492, 917 N.E.2d 450, 459 (2009).

> A statement is defamatory *per se* if its harm is obvious and apparent on its face. In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Id.* at 491–92, 917 N.E.2d at 459 (citation omitted).

Nelson claims that all defendants defamed her by spreading false explanations for her termination. As an initial matter, she presents no evidence that Zoldan or

Donaldson made any defamatory statements and presents no argument that they did so. The Court grants summary judgment in their favor on this claim.

Nelson's sole evidence that Kloster made defamatory statements comes from Nelson's own declaration. In the declaration, Nelson states that "Rhonda Rose with HarperCollins . . . called me shortly after I was terminated. She told me that Carol Kloster had told her everything about my termination and how it happened." Pl. Ex. G at 8. Though Rhonda Rose could testify about what Kloster said, testimony by Nelson about what Rose told her Kloster said is inadmissible hearsay. *See* Fed. R. Evid. 801–02; *Schindler v. Joseph C. Seiler & Synthes Spine Co.*, 474 F.3d 1008, 1010–11 (7th Cir. 2007) (plaintiff's testimony that a doctor told him that someone else was saying he paralyzed patients was inadmissible hearsay). Because there is no admissible evidence from which a jury could find that Kloster made any defamatory statement, the Court grants summary judgment in Kloster's favor on this claim.

Nelson does present evidence to support her defamation claim against Krey. Specifically, Nelson offers an affidavit from Thomas, who states:

> 20. After Levy terminated Nelson, Levy made the allegations against her public.
> 21. As an example, Janet Krey told me on several different occasions that Ms. Nelson: 1. Was using Levy's money; 2. Doing things under the table; 3. Using money that was not hers; and 4. Using her daughter's boyfriend to take money from Levy. This is not an exhaustive list. I also overheard a telephone conversation in the break room between Janet and a publisher in which she stated that Nelson was terminated for stealing.
> 22. Levy also announced in a marketing meeting that Nelson had misappropriated funds and that was the reason Levy terminated her.

Pl. Ex. F ¶¶ 20–22. Thomas's claim that "Levy" made certain statements does not give rise to a claim against any particular person, but she does provide sufficient evidence

for a reasonable jury to conclude that Krey made statements about Nelson.

Defendants claim that Krey's statements are true and thus cannot be defamatory. *J. Maki Constr. Co. v. Chicago Reg'l Council of Carpenters*, 379 Ill. App. 3d 189, 203, 882 N.E.2d 1173, 1186 (2008) (defendant not liable for defamation if the statements were true). "Only substantial truth is required" for Krey's statements to be nonactionable; she "need prove the truth of only the gist or sting of the statement." *Id.* (internal quotation marks omitted).

Viewing the evidence in the light most favorable to Nelson, no reasonable jury could find that Krey's statement that Nelson was doing things under the table was not substantially true. In the letter Nelson wrote to Kloster to explain her actions, she admitted that at various events, she paid laborers in cash to avoid union restrictions and the high rates Levy would have to pay if she requested that the event venues perform various tasks. Def. Ex. 9 at 113. Nelson's payments of cash to avoid higher rates imposed by venues was "under the table." *See. J. Maki Constr. Co.*, 379 Ill. App. 3d at 203, 882 N.E.2d at 1186 (claim that plaintiff had been convicted was substantially true, even though conviction occurred in union administrative proceeding and not in court).

Nelson has, however, presented sufficient evidence to show that there is a genuine factual dispute about whether Krey's statements that Nelson used money that was not hers and stole from Levy are substantially true. In her letter to Kloster and at her deposition, Nelson explained that she used the American Express gift checks to reimburse herself only when she had to use personal funds to business purposes because forgot to bring the checks to events or ordered them too late. Def. Ex. 3 at 68–69; Def. Ex. 9 at 114. Nelson's former supervisor, Mike Hesselbach, testified that

17

he approved her expense reports, although he acknowledged that they were often sloppy or insufficiently detailed. Pl. Ex. D at 41–45. Nelson also provided details of how she spent $8,700 in cash at four events. Def. Ex. 9 at 121–22, 126–31. Even though Kloster found Nelson's explanations unsatisfactory, a reasonable jury could find that Nelson had not taken Levy's money for herself.

Similarly, there is a genuine factual dispute regarding the truth or falsity of Krey's statement that Nelson was using her daughter's boyfriend to take money from the company. Nelson employed a man named DeVar Spight several times, including at a convention in Michigan. In her deposition, Donaldson agreed that Spight was an approved vendor for Levy, although she disputed that his $1,200 invoice accurately represented the work he had done at the Michigan convention. Def. Ex. 6 at 94–97. In her letter to Kloster, Nelson explained her reasons for hiring Spight, including that she had been impressed with his volunteer work before she began paying him. Def. Ex. 9 at 119. Nelson acknowledged that Spight and her daughter dated but said that this occurred only after Nelson began working with him. *Id.* A reasonable jury could conclude that Nelson had legitimate reasons for hiring Spight and that she was not using him to take money from Levy.

Defendants also argue that Krey's statements are not defamatory because they are "reasonably capable of an innocent construction." *Tuite v. Corbitt*, 224 Ill. 2d 490, 502, 866 N.E.2d 114, 121 (2006). "In considering allegedly defamatory statements under the innocent construction rule, . . . courts must interpret the words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Id.* at 511–12, 866 N.E.2d at 127. "Courts are not required to

strain to find an unnatural innocent meaning for words when a defamatory meaning is more reasonable. . . . [T]he innocent construction rule does not require courts to espouse a naivete unwarranted under the circumstances." *Id.* at 512, 866 N.E.2d at 127 (internal quotation marks omitted). Whether a statement is reasonably susceptible to an innocent construction is a question of law. *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009).

"[T]he context of a statement is critical in determining its meaning." *Tuite*, 224 Ill. 2d at 512, 866 N.E.2d at 127 (in a book about the mafia and corruption in the judicial system, statement that mobsters on trial celebrated after plaintiff, a lawyer, was paid $1,000,000 cash to represent them meant that book implied lawyer was going to pay bribes to get them off, even if lawyer was never explicitly accused of a crime). The only context for Krey's statements that the evidence suggests is that Krey made them after Nelson was terminated and that they are examples of Levy making public its allegations against Nelson. Pl. Ex. F ¶¶ 20–21. Taken in this context, Krey's statements were explanations of why Nelson was fired: she misused Levy's money, she siphoned money out of the company by hiring her daughter's boyfriend, and she was stealing. All of these statements suggest that Nelson lacked integrity in performing her job duties or that she had committed crimes. *Green*, 234 Ill. 2d at 491–92, 917 N.E.2d at 459. Krey's statements could not reasonably be interpreted to mean, as defendants suggest, that Nelson simply "was using Levy's money or money that was not hers in her capacity as Levy's Sales Promotions Director." Def. Reply at 13; *see Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 533–34 (7th Cir. 2009) (statements that plaintiff had intentionally failed to make contractual payments and had

19

no reason not to make payments were not capable of an innocent construction because the only reasonable interpretation was that plaintiff was unwilling to meet its financial obligations).

Defendants also argue that Krey's statement that Nelson used her daughter's boyfriend to take money from Levy was not specific enough to be actionable.  *See Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 518, 701 N.E.2d 99, 103 (1998) (statements of opinion are protected if they "cannot be reasonably interpreted as stating actual facts about the plaintiff").  The two cases that defendants cite, however, are distinguishable. *Hopewell* involved a statement that the plaintiff was fired for incompetence.  The court reasoned that the statement was not actionable because "incompetence" did not have a precise meaning and the truth of the statement was impossible to determine.  *Id.* at 519–20, 701 N.E.2d at 104.  Krey's statement, by contrast, is actionable because it is possible to determine whether Nelson actually used Spight to siphon money out of Levy or instead paid him for performing legitimate work.

In *Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 776 N.E.2d 693 (2002), the court held that a reporter's statement that evidence seemed to indicate that the plaintiff was cheating the city of Chicago was not actionable.  *Id.* at 762, 776 N.E.2d at 699.  The reporter's statement, however, was shown as a brief video clip only a few seconds long, one of several short clips comprising an ad for a television news show, and the clip provided no context or evidence.  *Id.*  In this case, by contrast, Krey's statement was made in a specific context, as a statement revealing why Nelson was fired.  Krey's statement was not as "broad, conclusory, and subjective" as the reporter's statement, *id.*, because it indicated that Nelson was fired for improperly giving Levy money to her

daughter's boyfriend, even though Krey provided no specifics.

Defendants finally argue that the two LLC defendants are not vicariously liable for Krey's statements. *See Arrington v. La Rabida Children's Hosp.*, No. 06 C 5129, 2008 WL 5388717, at *14 (N.D. Ill. Dec. 22, 2008) (discussing vicarious liability for defamation and concluding that employer was not liable for employees encouraging people to shun plaintiff because evidence was that employer did not condone statements and disciplined employees who made shunning comments). "[A]n employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment." *Bagent v. Blessing Care Corp.*, 224 Ill.2d 154, 163, 862 N.E.2d 985, 991 (2007). The court in *Bagent* stated that

> (1) Conduct of [an employee] is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the [employer].

*Id.* (internal quotation marks omitted).

As an initial matter, defendants argue that there is no evidence that Krey worked for Chas Levy. In a declaration, Krey states that she worked for LHE. Def. Reply, Ex. 2 ¶ 1. At her deposition, however, Krey stated that she had "worked for the Charles Levy Company for 24 years," Def. Ex. 5 at 11, and in her declaration she also mentions that she has worked for both LHE and affiliated companies. Def. Reply, Ex. 2 ¶ 2. Based on this evidence, a reasonable jury could find that Krey worked for Chas Levy or LHE.

There is also a genuine issue of fact regarding whether Krey made her statements about Nelson within the scope of her employment. Thomas's declaration indicates that Levy made public the allegations against Nelson and announced at

company meetings why she had been fired. Pl. Ex. F ¶¶ 20, 22. Thus, Levy might have wanted someone such as Krey, who Thomas states was promoted to replace Nelson, to explain why Nelson no longer worked for the company. *Id.* ¶ 24. Defendants note that Krey and Thomas did not get along or socialize and worked at different facilities, but those facts make it more likely that if Krey bothered to tell Thomas the circumstances of Nelson's termination it was because it was one of her job duties. Additionally, Thomas overheard Krey telling a publisher that Nelson was terminated for stealing. *Id.* ¶ 21. A reasonable jury could conclude that Krey was serving Levy's purpose by explaining to a publisher why Nelson no longer worked for Levy.

In sum, the Court grants summary judgment in favor of defendants Kloster, Donaldson, and Zoldan on Nelson's defamation claim but declines to enter summary judgment for the other defendants on this claim as it relates to Krey's statements that Nelson misused funds, used her daughter's boyfriend to siphon money out of Levy, and was terminated for stealing.

### 4.    Unjust enrichment

Under Illinois law, a plaintiff seeking to recover for unjust enrichment must show "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). "A cause of action based upon unjust enrichment does not require fault or illegality on the part of the defendants; the essence of the cause of action is that one party is enriched and it would be unjust for the party to retain the enrichment." *Eighteen Invs. v. Nationscredit Fin. Servs. Corp.*, 376 Ill. App. 3d 527, 535–36, 876 N.E.2d 1096, 1103

(2007) (brackets and internal quotation marks omitted).  Nelson claims that Levy has been unjustly enriched because she spent money for its benefit, yet Levy refused to reimburse her when she submitted two reports detailing the expenditures.  Levy, other the other hand, contends that Nelson has not provided evidence that she actually spent money to benefit Levy, and as a result Levy has not been unjustly enriched.

A reasonable jury could find that Nelson spent her money for the benefit of Levy and that it would be unjust for Levy to retain that benefit.  Nelson submitted two expense reports that Levy did not pay.  The first, submitted July 30, 2008, initially requested reimbursement in the amount of $10,587.55, but the typewritten report was later amended by hand to request $9,387.55.  Pl. Ex. G at 25.  The second, dated August 15 but which Nelson claims should have been dated September 15, requests $1,870.13.  *Id.* at 22.  In her declaration, Nelson states that she actually incurred all of these expenses.  *Id.* at 7.  She also provides invoices for some of the expenses, including $691.88 paid to a marketing company, a July 2008 bill from an Indianapolis hotel for $5,450.39, and five flights totaling $2,027.  *Id.* at 23–24, 34, 42, 44–51.  She also summarizes who she paid tips to and provides her American Express credit card statements to verify some of the other expenditures.  *Id.* at 43, 60–81.  From her testimony and this evidence, a reasonable jury could conclude that Nelson actually spent $11,357.68 for the benefit of Levy and that it would be unjust for Levy not to reimburse her.

Levy's primary argument in support of summary judgment is that Nelson did not comply with Levy's policies regarding expense reports and, in particular, did not provide receipts for all of the expenses she claims she incurred.  Nelson's unjust enrichment

claim, however, does not require her to prove that she provided Levy with all of the documentation of her expenses that it wanted or that Levy was satisfied that she had spent the money. Rather, Nelson must only provide enough evidence to permit a reasonable fact finder to find "that valuable services or materials were furnished by the plaintiff, [and] received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying." *Hayes Mech., Inc. v. First Indus., L.P.*, 351 Ill. App. 3d 1, 9, 812 N.E.2d 419, 426 (2004). Levy cites no authority for its argument that Nelson can demonstrate unjust enrichment only if she complied with Levy's expense report policies.

Although Levy may dispute that Nelson spent all of the money that she claims or that the expenditures benefitted it, there is a genuine issue of fact regarding what Nelson spent and whether Levy benefitted. Accordingly, the Court declines to enter summary judgment on this claim.

**5.    Conversion**

In its counterclaim, LHE contends that Nelson is liable for conversion because LHE reimbursed her for more than $7,000 worth of expenses she incurred at a Marriott hotel in August 2008. Although Nelson claims that she gave Marriott her credit card so that it could bill her, it is undisputed that Marriott never billed Nelson for the expenses but instead sent its bill directly to LHE, which paid the bill. Nelson concedes that she owes the money to LHE. She argues, however, that she did not convert the money because LHE voluntarily paid her.

"To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of

24

the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998). There cannot be a conversion if one person voluntarily transfers property to another; in that situation, even if the transfer was mistaken, a voluntary transfer merely creates a debtor-creditor relationship. *See Bill Marek's the Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill. App. 3d 996, 1006, 806 N.E.2d 280, 287 (2004); *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 891–92, 565 N.E.2d 93, 100 (1990) (no conversion when plaintiff inadvertently overpaid defendant and defendant would not return funds). "Courts have consistently held that there is no conversion where one has *voluntarily* transferred money to another." *Tahir v. Imp. Acquisition Motors, L.L.C.*, No. 09 C 6471, 2010 WL 2836714, at *6 (N.D. Ill. July 15, 2010) (emphasis in original) (no conversion when plaintiff voluntarily made payments to car dealership for car that was never delivered); *see Baron v. Chehab*, No. 05-3240, 2006 WL 156828, at *10–11 (C.D. Ill. Jan. 20, 2006) (no conversion when plaintiffs voluntarily gave money to defendants running fraudulent investment schemes).

In this case, LHE voluntarily transferred money to Nelson to reimburse her for the Marriott expenses. For this reason, it is not entitled to summary judgment on its conversion claim.

### Conclusion

For the reasons stated above, the Court grants in part and denies in part defendants' motion for summary judgment [docket no. 66]. Specifically, the Court grants summary judgment in favor of defendants on plaintiff's retaliatory discharge and

Whistleblower Act claims (Counts 1 and 2) and on plaintiff's defamation *per se* claim (Count 3) to the extent that it concerns defendants Kloster, Donaldson, and Zoldan. The Court otherwise denies defendants' motion.  The case is set for a status hearing on February 15, 2012 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

MATTHEW F. KENNELLY
United States District Judge

Date:  February 8, 2012